# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Brian Gutierrez Villasenor | ) | Case No. |
| | ) | |
| | ) | 3  18  70674 |
| *Defendant(s)* | ) | |

FILED
MAY 16 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __April 11, 2018 through May 7, 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and 841(b)(1)(C) | Distribution of Cocaine, a Schedule II Controlled Substance |

This criminal complaint is based on these facts:

Please see attached affidavit of FBI Special Agent Jonathan Clemens.

☑ Continued on the attached sheet.

Approved as to form: _____
AUSA Rita Lin

_____
*Complainant's signature*

FBI Special Agent Jonathan Clemens
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/15/2018

_____
*Judge's signature*

City and state: San Francisco, CA

Hon. Joseph C. Spero, U.S. Magistrate Judge
*Printed name and title*

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location:**
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

### OFFENSE CHARGED

21 U.S.C. 841(a)(1) & 841(b)(1)(C) (Distribution of cocaine)

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

**PENALTY:** Maximum 20 Years Imprisonment; Maximum Fine of $1,000,000 or twice the gain or loss; Minimum Supervised Release of 3 Years; Maximum Supervised Release of Life; Mandatory $100 Special Assessment; Deportation; Mandatory and Discretionary Denial of Federal Benefits

### DEFENDANT - U.S

▶ Brian Gutierrez Villasenor

**DISTRICT COURT NUMBER**

### PROCEEDING

**Name of Complaintant Agency, or Person (& Title, if any):** FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY  ☐ DEFENSE

**SHOW DOCKET NO.**

☐ this prosecution relates to a pending case involving this same defendant

**MAGISTRATE CASE NO.**

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

**Name and Office of Person Furnishing Information on this form:** Alex G. Tse
☒ U.S. Attorney  ☐ Other U.S. Agency

**Name of Assistant U.S. Attorney (if assigned):** Rita Lin

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction  } ☐ Federal  ☐ State
6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No  } If "Yes" give date filed

**DATE OF ARREST** ▶  Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶  Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT    **Bail Amount:** No bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

**Defendant Address:**

Date/Time:                    Before Judge:

**Comments:**

## AFFIDAVIT OF FBI SPECIAL AGENT JONATHAN CLEMENS

I, Special Agent Jonathan Clemens, being first duly sworn, hereby depose and state as follows:

### I.   INTRODUCTION

1.   I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Brian GUTIERREZ Villasenor with violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C) (distribution of cocaine).

2.   The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, information provided to me by or through other law enforcement agents, investigators and individuals with knowledge of this matter, and through my review of documents related to this investigation. This affidavit summarizes such information in order to show that there is probable cause to believe that GUTIERREZ violated Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C). This affidavit does not purport to set forth all of the evidence gathered to date in this investigation.

### II.   AGENT BACKGROUND

4.   I am a Special Agent with the FBI and have been so employed since August 2014. I am currently assigned to the San Francisco Divisional Office in California were I investigate Transnational and Darknet Organized Crime. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4.   I successfully completed a five month FBI New Agent Training Academy at the FBI Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code Sections 841 and 846. Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification,

AFF. IN SUPPORT OF APP. FOR VEHICLE TRACKER
FILED UNDER SEAL                                                 -1-

detection, interdiction, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

5. Prior to my employment with the FBI, I was an Officer and helicopter pilot in the United States Navy in which I flew over 700 hours in Operation Iraqi Freedom and Operation Enduring Freedom.

6. During the course of my employment as a FBI Special Agent, I have participated in approximately five investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, and records research, physical and electronic surveillance. I have assisted in court-ordered wiretap investigations, and I have participated in the execution of several federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics. I have attended seminars and courses on money laundering and advanced financial and internet investigations related to drug trafficking. Furthermore, I have served on the FBI's Special Operations Group specializing in covert surveillance of high priority criminal, intelligence, and terrorist subjects.

7. I have conducted and been involved in several narcotics and financial investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics. In the course of these investigations, I have investigated crimes in violation of Title 21, United States Code, Sections 841, 843, 846, 952, and 960, and Title 18, United States Code, Sections 1956 and 1957.

8. I have initiated and participated in approximately two Organized Crime Drug Enforcement Task Force (OCDETF) investigations. The OCDETF program is part of the United States Attorney General's strategy to reduce the availability of drugs by disrupting major

trafficking organizations through joint collaborations across agencies. I have monitored, supervised, conducted surveillance, or otherwise participated in several investigations that utilized electronic and/or wire interceptions. I have attended a training class focused on conducting electronic surveillance. In the course of working on investigations using electronic and/or wire interception, I have monitored, listened to, reviewed transcripts and/or "line sheets" of intercepted conversations. I estimate that the majority of these conversations involved the trafficking of methamphetamine and, cocaine, and heroin by Mexican DTOs, and that the majority of the narcotics trafficking conversations intercepted employed some form of code to thwart law enforcement.

9. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of vehicles, mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. Also, I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, launder drug proceeds, and their extensive use of encryption online to conceal their identities and the details of the transaction.

10. Over the past three years, I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply the use of electronic surveillance to investigating defendants that are trafficking narcotics internationally and/or across multiple jurisdictions within the United States.

### III. RELEVANT STATUTES

11. 21 U.S.C. § 841(a)(1) makes it unlawful for a person to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, controlled substances, including cocaine, a Schedule II controlled substance.

## IV. STATEMENT OF PROBABLE CAUSE

### A. Affiant Involvement With Subject Investigation

12. I am familiar with the facts and circumstances of the investigation through discussions with other agents of the FBI and other law enforcement agencies; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

13. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of the Requested Information, I have not included details of every aspect of the investigation. I have only set forth those facts that I believe are essential to establish probable cause for the requested warrant.

### B. Overview of Investigation

14. This investigation is being conducted jointly with members of the FBI, Homeland Security Investigations (HSI) and the Drug Enforcement Agency (DEA), and concerns the darknet website vendor "*JetSetLife*" that is believed to be operated by GUTIERREZ and others. As detailed below, there is probable cause to believe that *JetSetLife* is an international drug trafficking scheme selling controlled substances such as cocaine, methamphetamine, and MDMA on online marketplaces accessed through encrypted and anonymized internet connections. In the marketplaces where *JetSetLife* operates, drugs are typically mailed to customers who order them on the marketplace, and the customers make payment in bitcoin. As detailed below, there is probable cause to believe that GUTIERREZ has mailed drugs ordered from *JetSetLife*

C.    **Background of bitcoin, TOR, and the Dark Web**

15.    Based on my training, research, and experience, along with conversations with senior agents of the FBI, HSI, and DEA, I am familiar with the following relevant terms and information:

16.    The "dark web," also sometimes called the "dark net" or "deep web," is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). Sales are transacted through the use of digital currency known as Bitcoin. These online black-market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. A famous dark web marketplace, Silk Road, operated similar to legitimate commercial websites such as Amazon and eBay, offered illicit goods and services. Law enforcement shut down Silk Road in 2013. More recently active markets include AlphaBay and HANSA, which were investigated and shut down by law enforcement authorities in the U.S. and Europe.

17.    "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" that operate on the dark net site platforms. Vendors are usually distinct from the original dark net site creators or operators. Dark net sites usually operate an "escrow" system by which the marketplace holds the customer's payment in a separate wallet ("in escrow") until the customer confirms the vendor provided the goods or services, at which time, payment is released to the vendor. This system prevents vendors from simply stealing payments without ever completing a transaction.

18.    Customers, meanwhile, operate "customer accounts." It is possible for the same person to operate one or more customer accounts and one or more vendor accounts at the same time.

19.    The "Tor network," or simply "Tor" (the "Onion Router") is a special network of

computers on the Internet, distributed around the world, designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, locations and identities of the network's users. Tor operates by encrypting data transmitted to and from a Tor site by at different points or "nodes" layered like an onion. Therefore, enabling websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, referred to as "hidden services" on the Tor network. Such "hidden services" have complex web addresses, generated by a computer algorithm, using the .onion web domain and can only be accessed through specific encrypted web browser software, including a major dark-web browser known as "Tor Browser," designed to access the Tor network. One of the icons for the Tor Browser is a simple image of the Earth with purple water and bright green landmasses with bright green concentric circles wrapping around the planet to look like an onion.

20. Bitcoin (BTC) is a form of decentralized, convertible digital currency that exists through the use of an online, decentralized ledger system. Bitcoin is not issued by any government, bank, or company, but rather is generated and controlled through computer software operating via a decentralized network. To acquire bitcoin, a typical user will purchase them from a Bitcoin seller or "exchanger." Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law, ie. U.S. Dollars). When a user wishes to purchase bitcoin from an exchanger, the user will typically send payment in the form of fiat currency,[1] often via bank wire or ACH, or other convertible digital currency to an exchanger, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, often for a commission, will then typically attempt to broker the purchase with another user of the exchange that is trying to sell bitcoin, or, in some instances, will act as the seller itself. When a user acquires bitcoin, ownership of the bitcoin is transferred to the user's Bitcoin address. The Bitcoin address is somewhat analogous to a bank account number, and is comprised of a case-sensitive string of letters and numbers amounting to a total of 26 to 35

---

[3] Fiat currency is simply a currency established by government regulation or law, e.g.

characters. The user can then conduct transactions with other Bitcoin users, by transferring bitcoin to their Bitcoin addresses, via the Internet.

21. Little to no personally identifiable information about the payer or payee is transmitted in a bitcoin transaction itself. Bitcoin transactions occur using a public key and a private key. A public key is used to receive bitcoin, and a private key is used to allow withdrawals from a bitcoin address. These two keys by themselves rarely reflect any identifying information. All bitcoin transactions are recorded on what is known as the Blockchain. The Blockchain is a distributed public ledger that keeps track of all bitcoin transactions, incoming and outgoing, and updates approximately six times per hour. The Blockchain records every bitcoin address that has ever received a bitcoin and maintains records of every transaction for each bitcoin address. Digital currencies, including Bitcoin, have many known legitimate uses. However, much like cash, Bitcoin can be used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which Bitcoin can be used to move funds with high levels of anonymity.

### D.     Undercover drug purchases from JetSetLife

22. On April 11, 2018, acting in an undercover capacity, an undercover HSI Special agent placed an order with the vendor *JetSetLife* on the Dream darknet marketplace to purchase approximately seven (7) grams of "Peruvian Mother Pearl Cocaine 95%" (cocaine), a schedule II controlled substance. The order was placed using an undercover customer account on the dark net marketplace. The UC agent responded to *JetSetLife*'s posted online Dream advertisement for "7G Peruvian Mother Pear Cocaine 95%" that would be shipped by US mail in two to five days for $25. The total sales price including shipping was $716.60 (0.103 BTC) paid in bitcoin by the undercover agent through the Dream Marketplace escrow system. The undercover agent then sent a message to *JetSetLife* instructing the package to be delivered to a particular post office box ("UC PO Box") which actually was a USPIS controlled undercover PO Box. On April 23, 2018, HSI agents retrieved a package from the UC PO Box that contained a DVD case that contained

approximately 7 grams of a white powdery substance inside a Mylar package with green clown markings on the packaging. The white powder tested presumptively positive for the presence of cocaine. Following the delivery in the SDNY, agents in San Francisco were provided the tracking information on the USPS parcel which contained the suspected cocaine. FBI contacted the USPS, which indicated the parcel had been sent from a USPS facility at 1400 Pine Street, San Francisco, CA. An inspector with the USPIS reviewed security camera footage from the USPS facility, which was recorded on April 18, 2018, corresponding to the time and date when the package was sent from the USPS counter. The security camera footage depicted a Hispanic male, whose facial features matched those of GUTIERREZ as seen in his California Department of Motor Vehicles photograph, sending the SDNY seized parcel.

### E. Seizure and search of package mailed by GUTIERREZ

23. On May 5, 2018, US Postal Inspectors seized a package bound for Georgia. On May 7, 2018, a DEA narcotics K-9 "indicated" that the seized package contained narcotics. Pursuant to a Federal Search Warrant issued by the Honorable Joseph C. Spero, No. 18-70634 JSC, on May 7, 2018, US Postal Inspectors, DEA and FBI Agents opened the package to find a black plastic DVD case that was taped closed. Inside the DVD case was a sealed silver Mylar package. Within the Mylar was a small sealed package with green clown markings on one side and a white powdery substance inside. The unusual green clown markings on the packaging of the substance matched those in the *JetSetLife* package ordered by HSI on April 11, 2018, described above. On May 11, 2018, DEA laboratory analysis of the white powdery substance determined that it was 3.8 grams (net weight) of cocaine.

24. The US Postal Inspector obtained a copy of video surveillance footage from the U.S. Post Office, 1800 Taraval Street, San Francisco, CA 94116 which showed GUTIERREZ mailing the package on May 2, 2018.

G.     **Surveillance of GUTIERREZ at U.S. Post Offices**

25.    On Thursday, April 19, 2018, video surveillance footage at a post office at 1300 Evans Avenue, San Francisco, CA 94188 shows a man matching GUTIERREZ's appearance, as compared to his DMV photo, at the counter mailing packages from approximately between 7:35am and 7:40am. Shortly afterwards, surveillance footage shows the same person, again matching GUTIERREZ's appearance in his DMV photo and wearing the same clothes as in the first video, mailing packages at a post office at 180 Steuart Street, San Francisco, CA 94105, which is 4.6 miles away from the first post office, from approximately 8:16 am to 8:19 am. Finally, surveillance video shows that the same person matching GUTIERREZ's appearance made a third stop to mail packages at a post office at 1600 Bryant Street, San Francisco, CA 94103, which is 2.4 miles away from the prior post office, from approximately 9:20 am to 9:22 am. In my training and experience, GUTIERREZ's behavior of spreading his packages out among multiple post offices indicates that he was trying to avoid detection and that the packages likely contain contraband.

H.     **Surveillance of GUTIERREZ at 2271 ½ Mission Street, San Francisco, CA**

26.    On May 07, 2018, FBI, DEA, and US Postal Inspectors observed GUTIERREZ as he exited the front door of his residence, 2271 ½ Mission Street, San Francisco, CA. GUTIERREZ entered a blue Toyota Prius, CALP 60916B2 with a sticker for the company Uber on the rear window. The Prius stopped adjacent to Chase Bank, 5655 Geary Boulevard, San Francisco, CA. GUTIERREZ was observed making a transaction at a Chase Bank ATM before crossing the street and entering a U.S. Post Office, 5654 Geary Boulevard, San Francisco, CA. Agents observed GUTIERREZ inside the Post Office as he opened his backpack and mailed three "Priority Express" mail packages. All three were mailed at a cost of $24.70 per package. The return address on the packages was listed as "Allen Muller, 2200 45th Ave, San Francisco, CA 94116" and all three had a shape consistent with a DVD case as in previous mailed packages. He paid in cash and then exited the Post Office.

AFF. IN SUPPORT OF APP. FOR VEHICLE TRACKER
FILED UNDER SEAL                                       -9-

27. GUTIERREZ then entered a silver BMW with white paper plates believed to be a ride-share vehicle associated with Uber or Lyft and departed the vicinity of the Post Office, 5654 Geary Boulevard, San Francisco, CA. Agents observed GUTIERREZ as he exited the BMW and entered another U.S. Post Office, 3245 Geary Boulevard, San Francisco, CA. GUTIERREZ removed more packages from his backpack and was seen mailing three additional packages. Each was mailed at a cost of $24.70 per package. The three packages had return addresses listed as "Jeremiah Milton, 1858 36th Ave, San Francisco, CA 94122" and had a shape consistent with a DVD case as in previous mailed packages. GUTIERREZ grabbed additional Priority Express Mail postal slips and then exited the Post Office. He entered a white Toyota Corolla, CALP 7YCL309, with two stickers for the companies Uber and Lyft on the rear window of the Corolla. Agents observed GUTIERREZ in the ride-share vehicle for the duration of the trip. He exited the Corolla and walked and entered the front door of his residence, 2271 ½ Mission Street, San Francisco, CA.

28. Based on all of the foregoing, as well as my training, experience, and conversations I have had with senior investigators of FBI, HSI, and FBI, I submit that there is probable cause to believe that GUTIERREZ is distributing controlled substances including cocaine under the vendor name of *JetSetLife* on the dark net Dream marketplace. In addition, based on the recent surveillance of GUTIERREZ departing from 2271 ½ Mission Street, San Francisco, CA, utilizing ride-share services such as Uber to visit multiple U.S. Post Offices, and then returning to 2271 ½ Mission Street, San Francisco, CA, there is probable cause to believe that GUTIERREZ is presently in the Northern District of California.

## IV. REQUEST FOR AUTHORITY TO ARREST

29. Based on the foregoing, I request that the Court issue the proposed arrest warrant based on GUTIERREZ's violations of Title 21, United States Code, sections 841(a)(1) and (b)(1)(C) (distribution of cocaine).

30. I further request that the Court seal the warrant and the affidavit and application in

support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the FBI and other agencies working on the investigation, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Jonathan Clemens
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn to before me on this __15th__ day of May 2018.

_____
THE HONORABLE JOSEPH C. SPERO
CHIEF UNITED STATES MAGISTRATE JUDGE